UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JP MORGAN CHASE BANK, N.A.,

    Plaintiff,

and

FEDERAL DEPOSIT INSURANCE
CORPORATION,                              Case No. 09-14891

    Intervenor Plaintiff,            HON. MARIANNE O. BATTANI

v.

FIRST AMERICAN TITLE INSURANCE
COMPANY,

    Defendant/Intervenor Defendant.
_____/

**OPINION AND ORDER DENYING FIRST AMERICAN'S FIRST AND SECOND
MOTIONS FOR SUMMARY JUDGMENT AND
GRANTING IN PART AND DENYING IN PART FEDERAL DEPOSIT INSURANCE
CORPORATION'S MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on Intervening Defendant American Title Insurance Company's ("First American") First and Second Motions for Summary Judgment (Doc. 67; Doc. 97) and Intervening Plaintiff Federal Deposit Insurance Corporation's ("FDIC") Motion for Summary Judgment (Doc. 99). As receiver for Washington Mutual ("WaMu"), FDIC brings an indemnification claim against First American pursuant to a Closing Protection Letter ("CPL") that First American issued to WaMu in connection with a residential loan WaMu made to Ha Truong. First American argues that FDIC does not have standing to assert a claim under that CPL, and even if it did, it has not suffered any indemnifiable "actual loss." FDIC contends that it has standing, First American has admitted facts that

establish liability, and WaMu has suffered "actual loss" in excess of $1.7 million. For the reasons that follow, the Court **DENIES** First American's motions and **GRANTS IN PART and DENIES IN PART** FDIC's motion. Specifically, FDIC's motion is granted as to liability, but denied as to damages.

**I.     STATEMENT OF FACTS**

First American is a title insurance carrier that is authorized to issue title policies in Michigan. First American issues policies through a network of "issuing agents" authorized to bind it to policies. Patriot Title Agency LLC ("Patriot Title") was one of First American's issuing agents during the relevant period.

On September 10, 2007, Patriot Title closed a real estate transaction in which WaMu loaned Ha Truong $4.5 Million ("the Truong Loan") for the purchase of a luxury home in Grosse Ile Township, Michigan ("the Property"). First American authorized Patriot Title to issue First American title insurance commitments and acted as First American's "issuing" agent during this transaction. Patriot Title also acted as the "closing agent."

First American issued a CPL to WaMu in connection with the Truong Loan. The CPL contained First American's promise that if Patriot Title engaged in fraud with respect to WaMu's loan funds, then First American would "reimburse" WaMu for its "actual loss." Addressed to WaMu and "its successors and/or assigns as their interest may appear," the CPL provides:

> When title insurance of First American Title Insurance Company is specified for your protection . . . in connection with closings of real estate transactions on land located in the state of Michigan in which you are to be . . . a lender secured by a mortgage . . . the Company, subject to the Conditions and Exclusions set forth below, hereby agrees to reimburse you for actual loss incurred by you in connection with such closings when conducted by the

> Issuing Agent . . . referenced herein and when such loss arises out of: . . .
>
> 2. Fraud or dishonesty of the Issuing Agent handling your funds or documents in connection with such closings.

(Doc. 99 Ex. A). In addition to the CPL, Patriot Title also issued to WaMu a Commitment to provide it with a First American Title Insurance Policy ("Title Policy").[1]

In March 2008, First American discovered that Patriot Title fraudulently procured and closed the Truong Loan. After an investigation that was prompted by numerous complaints regarding Patriot Title, First American learned that Patriot Title, via its principal officer Randy Saylor, created a fictitious entity to act as the "seller," recruited Truong to act as a sham "buyer," and absconded with more than $4.5 million after WaMu wired the funds into Patriot Title's escrow account. As a result of Patriot Title's fraud, WaMu did not obtain an effective mortgage lien on the Property, there was no recorded deed vesting title in Truong, and a prior mortgage on the Property had not been discharged. In order to remedy the apparent title defects, First American acquired title and possession of the Property in June 2008.

In September 2008, the Office of Thrift Supervision took over WaMu for lack of adequate liquidity. FDIC was appointed as WaMu's receiver and immediately sold a majority of WaMu's assets to J.P. Morgan Chase Bank ("Chase"). The agreement between FDIC and Chase was set forth in a single form document known as the Purchase & Assumption Agreement (the "P&A Agreement"). (Doc. 67 Ex. D). Chase acquired the Truong Loan and related Title Policy under the P&A Agreement. To extinguish any

---

[1] First American explains that it never issued a title policy to WaMu pursuant to the Commitment. For the purposes of this motion, the parties, and the Court, assume a policy should have been issued. (Doc. 107 at 4 n.2).

possible claims that Chase could bring under the Title Policy, First American tendered a quitclaim deed for the Property to Chase. Chase refused to accept, maintaining that it was entitled to monetary damages under the Policy.

On December 16, 2009, First American filed suit against Chase in the Wayne County Circuit Court seeking a declaration that it had fulfilled its obligations under the Title Policy, and redress for Chase's alleged breach of contract. (09-14915 Doc.1). The next day, Chase sued First American in this Court for breach of contract, fraud, misrepresentation, and sought declaratory relief as to First American's obligations under the Title Policy. (Doc. 1). Chase removed First American's state court action to this Court and the two actions were consolidated.

In April 2010, FDIC moved to intervene and filed suit against First American to enforce the CPL. (Doc. 25). Chase and FDIC have stipulated that Chase did not acquire WaMu's CPL claim under the P&A Agreement. (Doc. 108 Ex. A). On April 11, 2011, the Court entered a Stipulated Order of Dismissal With Prejudice Of Claims Between Chase and First American. (Doc. 116). The Stipulation did not resolve FDIC's CPL claim against First American. The parties' cross motions for summary judgment are now before the Court.

## II. STANDARD OF REVIEW

Summary judgment is appropriate only when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). Rule 56

4

mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). The Court "must lend credence" to the non-moving party's interpretation of the disputed facts. Marvin v. City of Taylor, 509 F.3d 234, 238 (6th Cir. 2007) (citing Scott v. Harris, 127 S.Ct. 1769, 1775 (2007)). The non-moving party may not rest upon its mere allegations, but rather must set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. Hopson v. DaimlerChrysler Corp., 306 F.3d 427, 432 (6th Cir. 2002).

### III. ANALYSIS

#### A. Standing

First American contends that FDIC lacks standing to bring a claim under the CPL because it no longer owns the related Title Policy. First American explains that its obligations under the CPL and Title Policy are integrated, and therefore, FDIC cannot "sever" the CPL from the Title Policy and maintain an independent CPL claim. The Court

5

disagrees.

Title insurance underwriters generally issue title insurance polices through local "issuing agents." 2 JOYCE PALOMAR, TITLE INSURANCE LAW, § 20:11 (2010). The "issuing agents" typically close the underlying real estate sale and also act as the parties' "closing agents." Id. As is customary in the industry, the title insurance underwriter usually issues a closing protection letter in connection with the transaction "'[t]o verify the agent's authority to issue the underwriter's policies and to make the financial resources of the national title insurance underwriter available to indemnify lenders and purchasers for the local agent's errors or dishonesty with escrow or closing funds.'" New Freedom Mortg. Corp. v. Globe Mortg. Corp.("New Freedom"), 761 N.W.2d 832, 842 (Mich. App. 2008) (quoting PALOMAR, § 20:11). The closing protection letter is designed to persuade the underwriter's customers to trust their agents, thereby increasing policy sales. Id. at 842-43.

A closing protection letter is an indemnity agreement, not an insurance policy.[2] In a closing protection letter, "the underwriter agrees to indemnify the lender for any problems that arise from the closing agent's failure to properly apply the funds, as set forth in the closing instructions, and the title insurance commitment. Bergin Financial, Inc. v. First American Title Co. ("Bergin"), 397 F.App'x. 119, 125 (6th Cir. 2010) (quoting Ticor Title Ins. Co. v. Nat'l Abstract Agency, Inc., 2008 WL 2157046, at *5 (E.D. Mich. May 22, 2008); see also, Freedom Mortg. Corp. v. Burnham Mortg., Inc.,720 F.Supp.2d 978, 1003 (N.D. Ill. 2010) ("[T]he [closing protection letter] is a contract of indemnification and specific liability, not an insurance policy."). Consequently, the closing protection letter provides the

---

[2] FDIC and First American agree that a closing protection letter is a contract of indemnity. (Doc. 97 at 10; Doc. 108 at 11).

6

addressee with certain additional assurances independent of the underwriter's duties under the title policy. J. BUSHNELL NIELSEN, TITLE & ESCROW CLAIMS GUIDE, § 14.1 (2d ed. 2007).

The additional assurances in a closing protection letter are separate and distinct from the coverage afforded under a title policy. A title policy "is merely a contract to indemnify the insured for any losses incurred as a result of later found defects in title ... it insures only that the title to such property is unencumbered by unknown liens, easements, and the like which might affect the property's value." First Fed. Sav. and Loan Assoc. v. Transamerica Title Ins. Co., 19 F.3d 528 (10th Cir. 1994); see also Focus Inv. Assocs., Inc. v. American Title Ins. Co., 992 F.2d 1231, 1236-37 (1st Cir. 1993); Gibraltar Sav. v. Commonwealth Land Title Ins. Co., 905 F.2d 1203, 1205 (8th Cir. 1990). Comparatively, the closing protection letter contains the underwriters promise to reimburse the addressee if loss results from an agent's failure to follow closing instructions or to apply settlement funds in a honest fashion. New Freedom, 761 N.W.2d at 842; see also, PALOMAR, § 20:16. The main purpose of a closing protection letter is to make underwriters contractually responsible for loss caused by their agent's misconduct at closing. Bergin, 397 F.App'x at 125; see also, Metmor Financial, Inc. v. Commonwealth Land Title Ins. Co., 645 So.2d 295, 297 (Ala. 1993); PALOMAR, § 20:11. Thus, closing protection letters and title policies protect against entirely different risks.

The Michigan Court of Appeals recognized the coverage distinctions between a closing protection letter and a title policy in New Freedom. The plaintiff in New Freedom, a lender who held both a closing protection letter and the related title policy, sued the title insurer under the closing letter for losses sustained in connection with the issuing agent's failure to follow the plaintiff's closing instructions. New Freedom, 761 N.W.2d at 835. The

7

appellate court affirmed the trial court's dismissal of the claim because the plaintiff failed to establish that the issuing agent's conduct at closing created liability under the terms of the letter. Id. at 845-46. In so holding, the court acknowledged that an aggrieved addressee can bring a closing protection letter claim independent of title policy issued in connection with the letter. Id. at 843. The court flatly stated that since the purchase of a title policy is the consideration that supports the insurer's promise in the letter, "a breach of contract action may be maintained independent of the title insurance policy." Id.

In addition to New Freedom, other courts have allowed an addressee to bring a closing protection letter claim independent of the title policy. In Lehman Bros. Holdings, Inc. v. Hirota ("Hirota"), 2007 WL 1471690 (M.D. Fla. 2007), the court held that the plaintiff, a lender holding both a closing protection letter and the related title policy, could proceed under the closing letter to collect losses sustained in connection with the title company's closing agents' alleged mortgage fraud scheme in which they induced the plaintiff to fund thirteen loans based on false information. Similarly, in Lawyers Title Ins. Corp. v. New Freedom Mortg. Corp. ("Lawyers Title"), 655 S.E.2d 269, 274 (Ga. App. 2007), the appellate court found that a title insurer is required to indemnify the addressee under a closing protection for losses incurred as a result of the title agent closing a sham transaction, provided the adressee can establish at trial that the agent acted with an intent to deceive. In both of these cases, neither plaintiff brought a claim against the title insurer under the related title policy. With the above discussion in mind, the Court returns to First American's argument.

The CPL is not integrated into the Title Policy because First American's indemnification obligations under the letter are separate and distinct from its duties under

the Title Policy. New Freedom, Hirota, and Lawyers Title stand for the proposition that an addressee can bring a closing protection letter claim independent of the related title policy. The Court acknowledges that those courts were never specifically asked to rule on whether an addressee could bring a closing protection letter claim independent of a claim under the related title policy. The Court also notes that the plaintiffs in those cases held both a closing protection letter and a title policy. However, the opinions are nevertheless persuasive because they establish that the coverage afforded under the letter is wholly separate from the coverage under a title policy. See also, Lawyers Title Ins. Corp. v. Edmar Const. Co., Inc., 294 A.2d 865 (D.C. 1972) (underwriter liable under a closing protection letter for its agent's embezzlement of closing funds even though underwriter never issued a title policy). The protections under the instant CPL are not supplemental or ancillary to the Title Policy, they cover an entirely different category of loss. "The primary protection of the Letter remains as to the risk that the title agent or approved attorney will steal the money delivered to closing." NIELSEN, § 14.1. The protection offered in the CPL has nothing to do with title defects.

New Freedom precludes First American's contention that the CPL is not supported by consideration. The court in New Freedom expressly recognized that the purchase of a title policy is the consideration that supports the insurer's indemnification promise in a closing protection letter. New Freedom, 761 N.W.2d at 835. Accordingly, WaMu's purchase of the Title Policy is the consideration that supports First American's promise in the CPL to indemnify WaMu. The consideration does not evaporate simply because FDIC sold the Title Policy to Chase. First American could have tethered the CPL's protection to the Title Policy in the "Conditions and Exclusions" section of the letter, but it did not.

Contrary to its position, First American is not exposed to double liability under the circumstances presented. To satisfy its obligations to Chase under the Title Policy, First American acquired the Property from the record owner for $2,082,852.60 and tendered it to Chase. (Doc. 1 at 5; Doc. 84). Although Chase initially disputed whether First American could discharge its duties by tendering a quitclaim deed, after Chase sold the Property for $1,909,732.90, First American and Chase resolved the Title Policy claim. (Doc. 116). Under the CPL, FDIC is seeking $1,771,593.07 (plus interest), which is the difference between the book value of the Truong loan on the date of the sale to Chase and the original loan amount. (Doc. 99 at 20). Assuming FDIC recovers this amount, First American's total liability would be $3,854,445.67, which is less than the $4.5 million its agent stole. (Doc. 99 at 3-5). Under the circumstances presented, there is no risk of double recovery because First American's aggregate liability under both the Title Policy and the CPL does not exceed the amount that WaMu entrusted to Patriot Title.

**B.   First American's Liability Under the CPL**

**1.   FDIC's Eligibility**

The parties dispute whether FDIC is eligible to receive indemnification offered under the terms of the CPL. "An indemnity contract is construed in the same manner as other contracts." DaimlerChrysler Corp. v. G Tech Professional Staffing, Inc., 678 N.W.2d 647, 649 (Mich. App. 2003) (citations omitted). "The primary goal in the construction or interpretation of any contract is to honor the intent of the parties." Rasheed v. Chrysler Corp., 517 N.W.2d 19, 29 n. 28 (Mich. 1994). The intent of the parties is gleaned from the words used in the instrument. UAW-GM Human Resource Center v. KSL Recreation Corp., 579 N.W.2d 411, 414 (Mich. App. 1998) (citation omitted). "[A]n unambiguous

written indemnity contract must be enforced according to the plain and ordinary meaning of the words used in the instrument." DaimlerChrysler, 678 N.W.2d at 649 (citation omitted).[3]

Seizing on the phrase "[w]hen title insurance of First American Title Insurance Company is specified for your protection . . . in connection with closings of real estate transactions . . . in which you are to be . . . a lender secured by a mortgage," First American argues that the CPL only protects a lender currently holding a mortgage that is insured under a First American policy. Since FDIC sold both the Truong Loan and Title Policy, it lost coverage under the CPL. FDIC responds by arguing that once the CPL's protections apply, nothing in the language of the CPL divests WaMu of indemnification rights because it sold the Loan and Title Policy to Chase. The Court agrees with FDIC.

First American issued the CPL to persuade WaMu to trust Patriot Title with over $4.5 million in connection with the closing of the Truong Loan. The CPL was executed *prior* to closing. The language of the CPL provides that coverage attached upon execution because WaMu was "to be" a lender holding a mortgage and the Commitment "specified" that First American would issue WaMu a title policy if certain conditions were satisfied. FDIC subsequently stepped into WaMu's shoes by operation of law and acquired WaMu's rights under the CPL. There is no provision in the CPL which provides that WaMu would lose its indemnification rights if it subsequently sold the Truong Loan and Title Policy. Consequently, FDIC did not forfeit WaMu's protections under the CPL. Moreover, even after the transfer, FDIC continues to have a significant interest in the underlying transaction

---

[3] FDIC and First American agree that the CPL is unambiguous. (Doc. 97 at 10; Doc. 108 at 10).

11

because it sold the Loan to Chase at a loss attributable to Patriot Title's admitted fraud.

### 2. "Actual Loss"

The Court rejects First American's argument that WaMu has not suffered any "actual loss" as a result of Patriot Title's fraud. The CPL obligates First American to "reimburse" FDIC for its "actual loss" that "arises out of" the "[f]raud or dishonesty" of Patriot Title in handling the Loan funds. (Doc. 99 Ex. A). "It is well settled that an action for indemnity accrues when liability of the indemnitee becomes fixed (contract of indemnity against liability), or when the indemnitee has suffered an actual loss or damages (contract of indemnity against loss or damage). Rouge Steel Co v. Suli & Sons Cartage Inc., 2004 WL 1621191, *2 (Mich. App. 2004) (citing Sherman v. Spalding, 132 Mich. 249, 251; 93 N.W. 613 (Mich. 1903).

First American admits that Patriot Title committed fraud by diverting WaMu's loan funds for the benefit of its principal. (Doc. 107 at 10). WaMu's "actual loss" was the $4,543,593.07 which was misappropriated. It recognized this loss pre-receivership. FDIC is willing to agree it recovered $2,772,000.00 of this amount from Chase under the P&A Agreement, which represents the "book value" for the Truong Loan. (Doc. 99 at 14). FDIC explains it reduced the Loan's "book value" by $1,771,593.07 because it discovered the fraud. Id. For the purposes of this motion, it seeks to collect the difference between the "book value" and original disbursement under the CPL. The CPL was designed to cover this type of loss.

To avoid this conclusion, First American asks the Court to shift the point at which the loss is measured. First American claims the "actual loss" occurred when WaMu sold the

Truong Loan to Chase for less than the original loan amount. Thus, WaMu's "actual loss" was of its own making and not caused by Patriot Title's fraud. The Court rejects First American's position and finds Patriot Title's fraud was the most direct, natural, and foreseeable cause of WaMu's loss.

### C. First American's Affirmative Defenses

#### 1. The CPL and The P&A Agreement

Based on its own interpretation of the P&A Agreement, First American contends that FDIC sold the CPL claim to Chase and FDIC has no standing to bring suit. The Court declines to visit the interpretation issues because First American has not shown how it escapes the well-established rule that a stranger to a contract has no standing to challenge the parties' mutual understanding of their own contract. See City of Grosse Pointe Park v. Michigan Municipal Liability and Property Pool, 702 N.W.2d 106, 114 (Mich. 2005). FDIC and Chase agree that FDIC retained the CPL claim and have signed a Stipulation acknowledging the same. (Doc. 108 Ex. A). The Court will not interfere with the parties' intent. See Rasheed, 517 N.W.2d at 29 n. 28; UAW-GM Human Resource Center v. KSL Recreation Corp., 579 N.W.2d 411, 414 (Mich. App. 1998).

#### 2. Negligent Underwriting

First American contends that had WaMu's underwriting been more stringent, it would have discovered the fraud. It cites Powers v. Apcoa Standard Parking, Inc., 259 F.Supp.2d 606 (E.D. Mich. 2003) in support of its position. The court in Powers reviewed the standard to be applied when construing a contract of indemnity that purports to indemnify against the consequences of ones own negligence. The court noted that such a contract "is subject

to strict construction and will not be so construed unless it clearly appears that it was intended to cover the indemnitee's own negligence." Id. at 609 (citation omitted).

First American cannot avoid its indemnification obligations by arguing that WaMu was negligent in underwriting the Truong Loan. Even if the CPL fails to expressly cover losses arising from WaMu's own negligence, in light of Foodland Distributors v. Al-Naimi, 559 N.W.2d 379, 382 (Mich. App. 1996), WaMu's negligence is irrelevant. In Foodland, the appellate court stated "one accused of fraud may not raise as a defense the carelessness of the party defrauded." Id. (citing Rood v. Midwest Matrix Mart, Inc., 87 N.W.2d 186, 191-92 (Mich. 1957)). Additionally, as correctly argued by FDIC, contributory negligence is not a valid defense in a breach of contract case. Nelson v. Nw. Sav. & Loan Ass'n, 381 N.W.2d 757, 759 (1985). Thus, WaMu's failure to discover the fraud does not provide a basis for First American to avoid its indemnity duty under the CPL. See also, Lawyers Title Ins. Corp. v. New Freedom Mtg. Corp., 285 Ga. App. 22, 645 S.E.2d 536 (2007) (rejecting a contributory negligence defense raised in response to a closing protection letter claim).

Furthermore, even assuming that First American could raise a contributory negligence defense, it has failed to establish a prima facie case of negligence. Specifically, First American has not offered testimony on the applicable standard of care and has presented no evidence the WaMu breached that standard. Absent this evidentiary support, First American's critique of WaMu's underwriting process falls flat.

### 3. Impairment of Subrogation Rights

FDIC's sale of the Truong Loan did not impair the value of First American's subrogation claim. The CPL's subrogation clause provides:

When the Company shall have reimbursed you pursuant to this letter, it shall

14

> be subrogated to all rights and remedies which you would have had against any person or property had you not been so reimbursed. Liability of the Company for such reimbursement shall be reduced to the extent that you have knowingly and voluntarily impaired the value of such right of subrogation.

(Doc. 97 Ex. A). First American acknowledges that FDIC retained WaMu's fraud claims under the P&A Agreement (Doc. 97 at 17). By operation of the subrogation clause, if First American compensates FDIC for Truong and Patriot Title's fraud, "[First American] shall be subrogated to all rights and remedies which [FDIC] would have had against [Truong and Patriot Title] had [FDIC] not been so reimbursed." Even though FDIC sold the Truong Loan to Chase, and along with it the ability to seek a deficiency judgment against Truong, FDIC did not impair the value of First American's subrogation claim. First American is allowed to "step into the shoes" of FDIC and sue Truong and Patriot Title for fraud if it pays FDIC under the CPL.

### 4. Late Notice

First American argues the CPL claim is barred because FDIC did not promptly notify First American of its intent to make a separate claim under the CPL. The CPL provides that "[w]hen the failure to give prompt notice shall prejudice [First American], then liability of [First American] shall be reduced to the extent of such prejudice." (Doc. 97 Ex. A). First American explains it did not receive notice that FDIC would be filing a *CPL* claim until April 2010, but admits that it received notice of WaMu's *Title Policy* claim on April 18, 2008.

The Court rejects First American's "failure to give timely notice" defense. The record shows First American discovered Patriot Title's fraud well before WaMu had any knowledge that the fraud had occurred. (Doc. 99 at 18). There can be no doubt that First American

was preparing to defend the case, whether the claims were brought under the Title Policy or the CPL. Accordingly, First American suffered no prejudice that warrants any lessening of its liability under the CPL.

### D. Damages

Although FDIC is entitled to summary judgment on liability, the Court finds there is a genuine issue of material fact on FDIC's damages. For the purposes of this motion, FDIC is willing to give First American a $2,772,000.00 credit on its liability under the CPL. (Doc. 99 at 14). FDIC explains that WaMu reduced its "actual loss" by $2,772,000.00 when it sold the Truong Loan for book value to Chase. Therefore, First American remains liable for the difference between the book value and the original loan amount, which is $1,771,593.07. FDIC claims that WaMu reduced the book value due to Patriot Title's fraud. (Doc. 112 at 2). First American rejects FDIC's concession and persuasively argues that no one can say with any certainty how much Chase paid for the Truong Loan. (Doc. 107 at 14-17). What WaMu received from Chase is material because that amount reduces WaMu's "actual loss," which directly affects the amount of First American's liability under the CPL. Consequently, there is a genuine issue of material fact on FDIC's damages.

## IV. CONCLUSION

For the reasons discussed above, **IT IS HEREBY ORDERED** that First American's First and Second Motions For Summary Judgment (Doc. 67; Doc. 97) are **DENIED** and FDIC's Motion for Summary Judgment (Doc. 97) is **GRANTED IN PART** (as to liability) and **DENIED IN PART** (as to damages).

**IT IS SO ORDERED.**

                                             s/Marianne O. Battani
                                             MARIANNE O. BATTANI
                                             UNITED STATES DISTRICT JUDGE

**DATED:** June 10, 2011

## CERTIFICATE OF SERVICE

Copies of this Order were mailed to counsel of record on this date by ordinary mail and electronic filing.

                                             s/Bernadette M. Thebolt
                                             CASE MANAGER