UNTIED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JP MORGAN CHASE BANK, N.A.,

    Plaintiff,

and

FEDERAL DEPOSIT INSURANCE
CORPORATION,

    Intervenor Plaintiff,

v.

FIRST AMERICAN TITLE INSURANCE
COMPANY,

    Defendant / Intervenor Defendant.
_____/

CASE NO. 09-14891

HON. MARIANNE O. BATTANI

**OPINION AND ORDER**
<u>**GRANTING FDIC'S MOTION FOR LEAVE TO SUBMIT ADDITIONAL AUTHORITY
AND DENYING FIRST AMERICAN'S THIRD MOTION FOR SUMMARY JUDGMENT**</u>

    This matter is before the Court on Federal Deposit Insurance Corporation's ("FDIC") Motion for Leave to Submit Additional Authority (Doc. 124) and First American Title Insurance Company's ("First American") Third Motion for Partial Summary Judgment (Doc. 119). The Court heard oral argument on October 13, 2011. For the reasons that follow, the Court **GRANTS** FDIC's motion and **DENIES** First American's.

**I.    BACKGROUND**

    The Court has already recited the underlying facts of this case in its June 10, 2011 Opinion and Order Denying First American's First and Second Motions for Summary Judgment and Granting in Part and Denying in Part FDIC's Motion For

Summary Judgment. (Doc. 118 at 2-4). Those facts are incorporated as if fully set forth herein.

In the June 10, 2011 Opinion, the Court found First American liable to FDIC under the terms of the CPL for FDIC's "actual loss" sustained in connection with Patriot Title's fraudulent mishandling of the Truong Loan closing funds, but identified a fact question on the amount of FDIC's "actual loss." After obtaining leave from the Court, First American filed a third motion for summary judgment on the remaining damages question. (Doc. 119).

First American offers two additional facts in its motion. First, on September 10, 2007, Patriot Title used $73,125 of Truong Loan closing funds to pay a yield premium spread to Security Mortgage Corporation, the mortgage broker on the Truong Loan. (Doc. 119 Exs. A & B). Second, on September 17, 2007, Patriot Title wired $2,106,056.27 of closing funds from its escrow account to LTS Title Agency ("LTS") to close a land contract sale of the Property from Bellerive Estate, L.L.C. and Charles and Linda Frizzell (the actual record owners) to Randy Saylor, Patriot Title's principal. (Doc. 119 Exs. C & D). First American claims these two transactions show that Patriot Title properly applied $2,179,181.27 of closing funds to obtain the Property that was the subject of the Truong Loan.

FDIC filed a motion to submit additional authority after the parties completed briefing First American's motion. (Doc. 124). FDIC maintains that two recent court rulings – an unpublished per curiam decision from the Michigan Court of Appeals and an interim trial court order from the United States District Court for the Southern District

of Florida – should assist the Court in its interpretation of the CPL at issue in this case. The parties' motions are now before the Court.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate only when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).  Rule 56 mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323.  Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).  The Court "must lend credence" to the non-moving party's interpretation of the disputed facts. Marvin v. City of Taylor, 509 F.3d 234, 238 (6th Cir. 2007) (citing Scott v. Harris, 127 S.Ct. 1769, 1775 (2007)).  The non-moving party may not rest upon its mere allegations, but rather must set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice.

Rather, there must be evidence on which the jury could reasonably find for the non-moving party. Hopson v.DaimlerChrysler Corp., 306 F.3d 427, 432 (6th Cir. 2002).

### III. ANALYSIS

The Court addresses two prefatory matters before reviewing First American's motion. First, the Court grants FDIC's Motion for Leave to Submit Additional Authority (Doc. 124) as it finds the recently decided cases helpful in connection with the interpretation and analysis of the CPL. Second, although FDIC originally included attorneys' fees incurred in this matter as part of its "actual loss" under the CPL, at oral argument, FDIC informed the Court it was abandoning its pursuit of attorneys' fees as part of its CPL claim. The Court now turns to the remaining issue presented in First American's motion.

The parties dispute the starting point for measuring FDIC's "actual loss" under the terms of the CPL. An unambiguous written contract of indemnity, such as the CPL at issue in this case, must be enforced according to the plain and ordinary meaning of the words used in the parties' agreement. DaimlerChrysler Corp. v. G Tech Prof. Staffing, Inc., 678 N.W.2d 647, 649 (Mich. Ct. App. 2003) (citations omitted). "[A]n unambiguous contractual provision is reflective of the parties' intent as a matter of law. Once discerned, the intent of the parties will be enforced unless it is contrary to public policy." Able Demolition v. Pontiac, 739 N.W.2d 696, 700 (Mich. Ct. App. 2007) (citations omitted).

The controlling passage of the CPL provides that First American will "reimburse [FDIC] for actual loss incurred by [FDIC] in connection with such closing[ ] when conducted by [Patriot Title] . . . and when such loss arises out of . . . [f]raud or

4

dishonesty of [Patriot Title] handling your funds or documents in connection with such closings." (Doc. 99 Ex. A).

First American acknowledges that this Court has already found it liable to FDIC under the CPL. It reasons the question now becomes what portion of the Truong Loan closings funds were "stolen" or "misapplied," because that has to be the base number from which FDIC's "actual loss," if any, is measured. Anchoring its position around the second conditional phrase "when such loss arises out of . . . [f]raud or dishonesty of [Patriot Title] handling your funds," First American argues that Patriot Title did not mishandle the closing funds to the extent it used those funds as Saylor's down payment to purchase the Property from the record owners. It explains that since Patriot Title used this portion of the funds as WaMu instructed, i.e., to purchase the Property identified in the Truong Loan, such an amount cannot be included as part of FDIC's "actual loss." Similarly, First American claims FDIC cannot recover the yield spread premium that Patriot Title paid to Security Mortgage because that payment was made exactly as WaMu instructed. First American essentially argues when making the damages calculation, the Court must take into account the amount of funds that were *misapplied* by Patriot Title, and not focus simply on the amount of funds that WaMu actually loaned.

FDIC's position is straightforward by comparison. It argues the "actual loss" includes the entire $4,543,593.07 because the transaction was a fraud ab initio. FDIC highlights First American's admission that Patriot Title duped WaMu into making a loan to Truong, a straw borrower, so that he could purchase the Property from a phony seller who never had good title to the Property. Thus, FDIC's "actual loss" begins at

5

$4,543,593.07 because Patriot Title misappropriated the entire amount through a sham transaction.

The issue becomes which portion of the Truong Loan closing funds did Patriot Title mishandle. The analysis set forth in <u>First American v. Vision Mortgage</u> is persuasive on this question. 689 A.2d 154 (N.J. Super. App. Div. 1997). In that case, First American's issuing agent, Kenneth Levenson, an attorney, participated in a straw borrower scheme in which he and a group of co-conspirators created a fictitious buyer to obtain a loan from Vision to purchase real property from a crooked seller who had good title to the property. <u>Id.</u> at 154. Levenson closed the transaction in which the group forged the buyer's name on closing documents and on the mortgage from buyer to Vision. <u>Id.</u> at 155. First American issued Vision a title insurance policy and a CPL in connection with this transaction. <u>Id.</u> at 154-55. Two days after the closing, Vision assigned the mortgage to Residential Funding Corporation and agreed to repurchase it at a foreclosure sale in the event of fraud. <u>Id.</u> at 155. After Vision discovered the group's ruse upon the buyer's nonpayment of the mortgage, the assignee sold the property to Vision, and Vision sold it for less than the outstanding loan balance. <u>Id.</u> Vision filed suit against First American to recover the deficiency as "actual loss" under the terms of a CPL identical to the terms at issue in this matter.

On appeal of a judgment in favor of Vision, First American argued that since Vision actually received a mortgage upon which it could foreclose, there can be no "actual loss" under the CPL because Vision received precisely what it had bargained for. <u>Id.</u> at 156. The appellate court disagreed and affirmed the trial court. On the "handling of closing funds" issue, the court stated,

6

> [I]t is undisputed that Levenson notarized the forged signatures at least three times and took money from Vision on the pretext that it was being borrowed by Zarifian [the fictitious buyer]. Thus, there is no question but that there was fraud or dishonesty by the Approved Attorney in handling the closing documents and funds within the meaning of the Closing Protection Letter.

Id.

Satisfied that Levenson's mishandling of the closing funds fell within the scope of the CPL, the court next addressed Vision's "actual loss" under the CPL:

> While it is true that Vision had first lien status, despite Levenson's fraud, and that the validity of its mortgage was not affected by that fraud, this was a sham transaction from the outset. Levenson and his cohorts stole Vision's money by falsely using the name and financial credentials of Zarifian, a stranger to the transaction. This guaranteed an immediate default because there was no bona fide mortgagor to make the mortgage payments. It also eliminated the possibility of Vision recouping a foreclosure loss through a deficiency proceeding against the mortgagor. Thus, of the three remedies for which a lender bargains in a bona fide transaction (payment, foreclosure and recovery of any deficiency), only one was available to Vision (foreclosure) as a direct result of Levenson's fraud.

Id. at 157. Ultimately, the court held First American liable for the deficiency as Vision's "actual loss." Id.

The court also discussed a policy reason for holding First American liable: "[b]y making Levenson an Approved Attorney [an attorney upon whose certification of title First American issues title insurance], First American put him in the position to steal from Vision by creating this sham transaction," adding that, "the title insurance company was in the best position to prevent the loss created by the fraud and defalcation of the Approved Attorney." Id.

Under the terms of the CPL, and the logic of First American v. Vision, the Court finds that Patriot Title mishandled $4,543,593.07 in WaMu's closing funds, the entire

7

amount of the Truong Loan.  First American admits that Patriot Title fraudulently manufactured the entire Truong Loan.  WaMu thought it had bargained for a legitimate mortgagor with the financial ability to make mortgage payments, a valid first lien on the Property to secure that mortgage, and the right to seek a deficiency against the mortgagor in the event of a foreclosure.  In reality, the purported seller never owned the Property, Truong never intended to make payments, and WaMu never obtained a valid mortgage.  It is obvious that WaMu did not receive what it had bargained for.  Accordingly, Patriot Title could never have honestly handled WaMu's closing funds because a legitimate transaction never existed.

To escape this conclusion, First American argues Patriot Title properly applied $2,106,056.27 because it used those funds to "ultimately" acquire the Property through Saylor's land contract with the actual owners.  It adds that Patriot Title could not have mishandled the $73,125 yield spread premium because it applied those funds exactly as instructed.  First American is suggesting that FDIC's "actual loss" is reduced by the extent that Saylor used a portion of the fraudulently procured closing funds to acquire, in his own name, the Property that WaMu thought Truong was buying.  In other words, so long as the misappropriated closing funds were used to acquire the Property as contemplated, FDIC suffers no "actual loss" as to that amount.  The Court flatly rejects this position.

First, a plain reading of the CPL does not support First American's peculiar interpretation of the "handling your funds" clause.  Under the CPL, First American indemnifies FDIC for its "actual loss" resulting from Patriot Title's mishandling of the entrusted closing funds.  The CPL contains no language to reduce that loss by the

8

extent that someone other than the intended borrower used the closing funds to obtain the Property in a transaction separate and distinct from the transaction that the parties intended the CPL to cover.  Moreover, since there is no extrinsic evidence to reveal what the parties intended the "handling your funds" clause to mean, to the extent that clause is ambiguous, the rule of *contra proferentem* applies, and that clause must be construed against First American.  See Fifth Third Mortgage-MI, L.L.C. v. Hance, Docket Nos. 294633, 294698, 2011 WL 4501573, *5 (Mich. Ct. App. September 29, 2011) (holding that to the extent a closing protection letter's terms are ambiguous in the absence of extrinsic evidence concerning the parties' intent regarding those terms, the rule of *contra proferentem* applies, and the disputed terms should be construed against the drafter).  Consequently, the Court dismisses First American's narrow interpretation of the "handling your funds" clause.

Second, the record shows that Patriot Title's principal used the closing funds as a down payment to buy the Property *in his own name*, seven days *after* the Truong Loan was set to close.  (Doc. 119 Ex. D at 1).  This transaction is the touchstone of FDIC's CPL claim.  Patriot Title and Saylor obtained funds from WaMu on the pretext they were going to be used by Truong.  In actuality, Saylor used them to buy the Property in his own name.  Such action unmistakably evidences a fraudulent and dishonest handling of the closing funds.  First American's submission that Saylor intended to eventually convey the Property to Truong is irrelevant in the computation of FDIC's "actual loss".  His intention regarding the Property after the fraud was complete has no bearing on the amount of "actual loss" FDIC suffered in this transaction.

9

Finally, First American ignores the reality of Patriot Title's fraudulent scheme by claiming that it properly paid the yield spread premium. WaMu agreed to pay this charge to the extent Patriot Title led it to believe the Truong Loan was legitimate. Absent Patriot Title's fraud, there was no need for WaMu to make this payment. The Court cannot agree that Patriot Title honestly handled this portion of the closing funds given its overarching fraud in this case.

In sum, the starting point for measuring FDIC's "actual loss" begins at $4,543,593.07 because Patriot Title mishandled the Truong Loan closing funds in their entirety. Accordingly, First American's motion is denied.

## IV. CONCLUSION

For the reasons stated above, FDIC's Motion for Leave to Submit Additional Authority (Doc. 124) is **GRANTED** and First American's Third Motion for Partial Summary Judgment (Doc. 119) is **DENIED**.

**IT IS SO ORDERED.**

s/Marianne O. Battani
MARIANNE O. BATTANI
UNITED STATES DISTRICT JUDGE

DATE:  October 26, 2011

CERTIFICATE OF SERVICE

I hereby certify that on the above date a copy of this Order was served upon all parties of record, electronically.

s/Bernadette M. Thebolt
Case Manager